## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

| | |
|---|---|
| PAUL LONG and KIANDRA LOVE<br><br>*Plaintiffs*,<br><br>v.<br><br>BITCONNECT INTERNATIONAL, PLC, BITCONNECT LTD, AND BITCONNECT TRADING LTD, and RYAN MAASEN A/K/A CRYPTO RHYNO.<br><br>*Defendants*. | CASE NO:   6:18-cv-00154-RBD-DCI<br><br><br>CLASS ACTION<br><br><br><br>JURY TRIAL DEMANDED |

## AMENDED CLASS ACTION COMPLAINT

Plaintiffs, Paul Long and Kiandra Love ("Plaintiffs"), on behalf of themselves and others similarly situated ("Class"), and pursuant to this Court's Order dated February 13, 2018 respectfully submit the instant Amended Class Action Complaint and Jury Demand against Defendants Bitconnect International, PLC, BitConnect LTD and Bitconnect Trading, LTD (collectively, "BitConnect"), and Ryan Maasen a/k/a Crypto Rhyno ("Maasen"), for financial losses suffered from an online investment scam.

## INTRODUCTION

1.      BitConnect scammed thousands of Floridians and hundreds of thousands of Americans out of millions and millions of dollars through a website called bitconnect.co.

2.      BitConnect took advantage of the increased attention, interest and success of cryptocurrencies and legitimate cryptocurrency-related companies and technology to convince Plaintiffs and the Class that they would make money on their investment in BitConnect's product.

3.      As part of their scam, BitConnect relied upon, communicated with and otherwise benefited from people like Maasen.  Maasen created YouTube videos that marketed BitConnect and convinced people to deposit money onto BitConnect's website.

4.      But BitConnect was both a pyramid scheme and a Ponzi scheme.  That is, it relied on new money from new users to pay existing users, and who were in turn expected to get more new users to produce more new money, while not actually engaging in any real activity that would produce income, profits or benefit to investors.

5.      In its scheme, BitConnect required Plaintiffs and the Class to provide BitConnect with Bitcoin, which it would exchange for BitConnect Coins ("BCC").  With this transaction, BitConnect promised to Plaintiffs and the Class fixed returns as well as a guarantee that the principal investment/loan amount would be paid in full on a date certain.

6.      Instead, BitConnect shut down its platform, took all of Plaintiffs and the Class's money, and left them with BCC, which is either entirely worthless or has significantly less value than BitConnect promised.

7.      While Plaintiffs and the Class suffered damages, BitConnect and Maasen have profited handsomely at the expense of Plaintiffs and the Class.

8.      Plaintiffs seek monetary damages for these losses, in an amount to be determined at trial.

9.      Plaintiffs also seek injunctive relief, in the form of: (1) specific enforcement and/or rescission of the contract between BitConnect and Plaintiff and the Class; (2) a return of all money and/or cryptocurrencies given to BitConnect by Plaintiffs and the Class; (3) disgorgement of all monies earned by Defendants due to their conduct; and/or (4) an immediate order enjoining BitConnect and its owners, members and Board of Directors from transferring, selling, spending

or otherwise dissipating any assets so that Plaintiffs and the Class can recover the money owed to them.

## JURISDICTION

10.     This Court has jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the proposed Class consists of 100 or more members; the amount in controversy exceeds $5,000,000, exclusive of costs and interest; and minimal diversity exists. This Court also has supplemental jurisdiction over the Florida state law claims pursuant to 28 U.S.C. § 1367.

11.     This Court has jurisdiction over the Defendants because the injuries occurred in this District and because of the specific actions of the Defendants that purposefully, knowingly and intentionally reached this District.  BitConnect operated a website and allowed Plaintiffs and the Class to sign up for the website with their Florida addresses.  Maasen published dozens of videos on Youtube.com that he knew would be viewed in this District and accepted the benefit of transacting with Florida citizens by receiving money from Plaintiffs and the Class who signed up for BitConnect under Maasen's affiliate codes.  These affiliate codes earned Maasen money that he generated because of his specific contacts in and activities directed towards Florida.

## VENUE

12.     Venue is proper in the Middle District of Florida under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District. Plaintiffs reside in this District, viewed Defendants' representations and misrepresentations in this District, engaged in commerce with Defendants from their computers in this District, and otherwise specifically performed their end of the bargain in this District.

3

## PARTIES

13.     Plaintiff Paul Long is an individual domiciled in Volusia, Florida, within this District.

14.     Plaintiff Kiandra Love is an individual domiciled in Orange City, Florida, within this District.

15.     Defendants BitConnect International, PLC, BitConnect LTD and BitConnect Trading, LTD (collectively, "BitConnect") are foreign, for-profit companies organized under the laws of the United Kingdom, doing business worldwide through the website bitconnect.co.

16.     BitConnect International's principal place of business is Grant Thornton House, 22 Melton Street, Kings Cross, London, United Kingdom NW 1 2EP.

17.     BitConnect LTD's principal place of business is The Panorama, Park Street, Ashford, United Kingdom TN24 8EZ.

18.     BitConnect Trading LTD's principal place of business is 23 St. Elizabeth Avenue, Bootle, United Kingdom, L20 6FA.

19.     Upon information and belief, Ryan Maasen is a citizen of Tulsa, Oklahoma.

## FACTUAL ALLEGATIONS

20.     A blockchain is a distributed record of transactions, usually managed by a peer-to-peer network of computers that validates the transactions.

21.     Bitcoin is the most well-known type of blockchain-based cryptocurrency and became synonymous with blockchain technology in the public consciousness in 2017 thanks to the huge spike in Bitcoin's price.  Bitcoin began 2017 at around $1,000 per coin, and reached highs of above $19,000 in early December, before falling back to around $12,000 in mid-January 2018.

22.     Alongside Bitcoin, other blockchain "coins" experienced huge increases in value during 2017.  For example, Ethereum, another cryptocurrency, had its coin, known by the initials "ETH," priced at around $8 on January 1, 2017, and ended 2017 at around $721.

23.     Cryptocurrencies, including Bitcoin and ETH, are inherently volatile, unstable, subject to the whims of investors worldwide, and have experienced huge price swings on a daily basis and across various different exchanges.

24.     Against this backdrop, BitConnect created a trading and lending platform that promised substantial, fixed returns and a total return of principal at a fixed time in the future that benefited from volatility.

25.     That is, users like Plaintiffs and the Class would invest money in BitConnect through a "lending" platform, BitConnect would pay them a daily interest rate, together with a bonus interest percentage, and then return the principal amount "lent" or invested.

26.     BitConnect promised these returns through a secret, proprietary trading algorithm called "volatility software interest," which it claimed would produce returns sufficient to pay these fixed interest rates plus bonuses for bigger investors.

27.     BitConnect repeatedly referred to this as an investment, and offered and sold its investments through its "BitConnect Lending Program."

28.     To effectuate the transactions described in this Complaint, BitConnect created its own coin called BitConnect Coin ("BCC").  BCC had no inherent value and no use other than trading for Bitcoin.

29.     Under the "BitConnect Lending Program," investors would "invest" into the BitConnect BCC Exchange with Bitcoin – either by using Bitcoin already owned or purchasing Bitcoin with a fiat currency.

30.     Once an investor deposited the Bitcoin into the BitConnect BCC Exchange platform, BitConnect instructed the investors to sell their Bitcoin to BitConnect in exchange for BitConnect's digital coin, known as "BCC."

31.     Then, BitConnect instructed the investors to "lend" their BCC back to BitConnect, explaining that the BCC "lent" would be used to fund the trading activities of its secret, proprietary trading system called "volatility software."

32.     On January 9, 2018, the Secretary of State of North Carolina issued a Temporary Cease and Desist Order against BitConnect to stop it from violating state securities laws.  Many of the details and allegations herein were alleged by North Carolina in seeking and issuing its Order.

33.     BitConnect describes itself as "an open source all in one bitcoin and crypto community platform designed to provide multiple investment opportunities with cryptocurrency education where it is entirely possible to find the independence we all desire, in a community of like-minded, freedom loving individuals who, like you, are seeking the possibility of income stability in a very unstable world."[1]

34.     BitConnect claimed investors could "begin staking or holding BitConnect Coin and watch [their] interest grow" and that "the more [investors] hold, the more [they] earn." [2]

35.     BitConnect represented that:

     a.   BitConnect Coin is "the investment tool [investors] need to jump start [their] financial security;"

---

[1] https://bitconnect.co/, last visited 2018-02-13
[2] https://bitconnect.co/bitconnect-learning/1/what-is-bitconnect, last visited 2018-02-13

    b.   Investors can "[s]ecure [their] future by gaining quick profit growth for tomorrow that is practical and attainable;"

    c.   The investment ensures "financial freedom is available and [investors] can start today. Store and invest wealth and earn substantial interest and investment;" and

    d.   Investors who purchase BitConnect Coin are purchasing "an interest bearing asset with 120% return per year. It is that simple."[3]

36.    These representations, while seemingly too good to be true for most investments, were in line with the rise of cryptocurrency trading and investing in 2017, and therefore were believable and concrete, and made it reasonable for Plaintiffs and the Class to rely upon and believe these representations.

37.    BitConnect offered up to 40% interest per month through its secret trading system it called "volatility software."[4]

38.    BitConnect published the following graphic on its website, which Plaintiffs and the Class saw and relied upon, that stated:

---

[3] https://bitconnect.co/bitcoin-information/18/investing-in-bitconnect-coin-and-staking, last visited 2018-02-13

[4] *Id.*



39.    BitConnect touted the lending program investment as a "safe way to earn a high rate of return on…investment[s] without having to undergo a significant amount of risk."

40.    BitConnect provided a chart that bolstered the misrepresentation that the returns from the BitConnect Lending Program are guaranteed, and that Plaintiffs and the Class would receive the principal capital invested within a set period of time, and that the more money invested, the sooner Plaintiffs and the Class would receive the money back:

## BitConnect Coin Lending Profits Interest

| Lending Amount | Interest (Accrued Daily) | Capital Back |
|---|---|---|
| $100 - $1000 | Volatility Software Interest (up to 40 % Per Month) | After 299 Days |
| $1010 - $5000 | Volatility Software Interest + 0.10% Daily (up to 40 % Per Month) | After 239 Days |
| $5010 - $10000 | Volatility Software Interest + 0.20% Daily (up to 40 % Per Month) | After 179 Days |
| $10010 - $100000 | Volatility Software Interest + 0.25% Daily (up to 40 % Per Month) | After 120 Days |

41.     BitConnect published daily interest and interest histories to show how much it had paid out over a previous term:



42.     BitConnect's promises of returns were bolstered by promoters and affiliates such as Maasen.  Maasen published dozens of videos on YouTube.com, all of which he has taken down and admitted that he has taken down, where he made numerous representations seen by, relied upon and that damaged Plaintiffs and the Class.

43.     One of his videos is still available through another channel: https://www.youtube.com/watch?v=mTVvO5l0oKQ (last accessed January 25, 2018).

44.     Plaintiffs incorporate each and every representation made in that video into this Complaint.  Because the transcript of the video is too long to include in the Complaint, Plaintiffs offer the following examples of the representations.

45.     In the video, Maasen makes numerous representations about BitConnect and his gains, the average daily interest rate, how he is familiar with the BitConnect team and that they have a great support team, that if a user invested more, he or she would be able to make more, and

sooner, that the investor would get the money back at the end of the term (repeated

multiple times in multiple different ways), and other similar representations, all of which Plaintiffs

and the Class viewed and relied upon.

46.    Maasen knew that viewers of his video were young, as he specifically referred to

two years as a "short" period of time, even if the college aged or high school kids watching the

video thought it was a long time.

47.    Maasen specifically represented that Plaintiffs and the Class would get their

principal back in a specific amount of time (299 days with a $100 investment).

48.    Maasen specifically represented that within two years Plaintiffs and the Class could

make a million or more dollars from this investment.

49.    Maasen specifically represented in the video that he was demonstrating investment

returns and that it really worked.

50.    Maasen published dozens of substantially similar videos with substantially similar

representations, and Plaintiffs and the Class viewed and relied upon the representations in

Maasen's videos to choose to sign up under Maasen's affiliate program, deposit money into

BitConnect, and lose that money.

51.    Maasen benefited from each person who he directed to BitConnect, earning money

on the money those people deposited.  In that way, BitConnect was both a Ponzi scheme and a

pyramid scheme.

52.    As an example of one of the many images of guaranteed returns in the

"Compounding Machine", he included this spreadsheet:



53. BitConnect and Maasen published the same message about investment, namely, that this was a guaranteed daily interest payment, with bonuses, and a guaranteed return of principal after a certain amount of time. Maasen encouraged his viewers, including Plaintiffs and the Class, to re-invest the daily interest payments back directly into more BitConnect lending. Thus, even Plaintiffs and the Class who received interest payments did not actually make money or keep those profits, and lost all profits when BitConnect closed down the lending program and left investors with worthless BCC.

54. BitConnect repeatedly referred to the lending program as an investment on its website:

a.    "You can invest BitConnect coin in BitConnect lending platform exclusively from the BitConnect Dashboard. This investment option involves profiting from BitConnect trading bot and volatility software. You will receive daily profit based on your investment option;"

b.    "Upon investment term completion, you will receive your CAPITAL BACK to take out from the BitConnect lending platform or optionally reinvest back in lending platform to continue receiving daily profit;" and

c.    "It takes 15 days to mature your coin from last received interest block. Once you received interest block in your staking wallet, you are required to wait for another 15 days to find next interest block."

55.    BitConnect provided daily interest charts that showed no days with negative returns on the entire chart:



56.    An average daily interest rate of 1% would produce average yearly returns of 3,000% which, while rare in financial markets, are in line with the returns seen in crypto markets

in 2017, and therefore Plaintiffs and the Class reasonably believed that these returns were available to them here.

57.     This is especially true because Maasen personally invested in and profited from BCC, as he represented in his videos, and these returns had been consistent for months.

58.     Plaintiffs and Class would have expected to profit from the efforts of BitConnect and its agents.

59.     Plaintiffs and Class would have believed, based on BitConnect's statements in its promotional materials, that investors could profit by merely holding and staking BCC tokens, or enjoying the guaranteed returns provided by BitConnect's proprietary, secret trading system that it calls "volatility software." Further, investors would have expected that BitConnect and its agents would expend significant efforts to continue to develop the proprietary, secret trading system that it calls "volatility software," and that such development would increase the value of their BCC.

60.     BitConnect represented to Plaintiffs and the Class that "Investing on BitConnect platform…is a safe way to earn a high rate of return on your investment without having to undergo a significant amount of risk."

61.     BitConnect also represented to Plaintiffs and the Class that "The interest rate that we can guarantee on your investment while using our investment platform is calculated by our BitConnect Price Volatility Software and accrued daily."

62.     Based on the statements listed above, Plaintiffs and the Class reasonably expected that they would profit solely from the essential managerial efforts of BitConnect.

63.     BitConnect intentionally misled Plaintiffs and the Class, and intentionally withheld material facts about BitConnect from Plaintiffs and the Class, including, but not limited to, the following:

a. The identity of the principals of BitConnect and the true location of BitConnect's operations and management;

b. Information about the assets and liabilities of BitConnect and any other information that indicates the means by which BitConnect will provide investors with a guaranteed daily return, regardless of the value of Bitcoin;

c. Information about the proprietary, secret trading system that it calls its "volatility software," details of its trading records and historical performance, proof of its existence, and the risk factors associated with its use;

d. That the BitConnect investments are securities and are not registered with the Administrator or any other governing regulator;

e. That only registered dealers or agents can be paid commissions for referrals or sales of securities; and

f. That affiliates who receive such commissions for their sale of BitConnect investments without being properly registered are in violation of the Securities Act of 1933.

64. In addition, BitConnect had token language about investment risks on its website. In the Risk Disclosure section of its website, which it did not require any user to actually view before using BitConnect and depositing money, BitConnect noted that "There is no guarantee of investor's capital if the lending system fails due to any of the reasons mentioned above."

65. Those reasons were:

# Risk Disclosure

Virtual currency such as Bitcoin is not legal tender, and is not backed by the government. Legislative and regulatory changes or actions at the state, federal, or international level may adversely affect the use, transfer, exchange and value of Bitcoin. Transactions in virtual currency such as Bitcoin are irreversible, and accidental transactions may not be recoverable. The volatility and unpredictability of the price of virtual currency relative to the fiat currency may result in significant loss over a short periods of time. Any technological difficulties experienced by the Bitconnect system may prevent the access or use of members virtual currency temporarily or permanently, depending on the severity of damage.

There are risks associated with trading and investing. If there should be a system failure, hacking incident or technical failure these terms apply to the members.

For lending, we pool the member's funds for our volatility software and trading bot. This is in case we make a loss with trading or there is any technical failure of the platform or a sudden drop in asset value that we are holding.

In lending, the member agrees that they cannot terminate their contract before the term plan has ended which the member has chosen.

All lending activities are reported in lending wallet consequently members will receive all capital and interest payments in lending wallet and you are required to Transfer your lending wallet balance to your Bitconnect wallet at the current BCC exchange rate.

Members should note that there is no guarantee of daily profit for lending.

Bitconnect reserves the right to institute and implement new rules of paying interest and capital if Bitconnect lending fail in any way.

Bitconnect reserve the right to change the lending algorithm, the interest payment and capital back system.

There is no guarantee of investor's capital if the lending system fails due to any of the reasons mentioned above.

66.     Not listed is that disclosure was a risk BitConnect could unilaterally shut down its lending platform, convert all of people's investments into BCC, tank the market for BCC by eliminating any future value of BCC, and close up shop.

67.     Not listed in the disclosure was the reason or reasons that BitConnect actually shut down its lending platform, causing Plaintiffs and the Class to lose their investments.

68.     Nor did BitConnect properly disclaim any promises of profits, returns, or the ability to unilaterally alter the contract and not pay back the investment principal, in full, on the date promised.

69.     On January 4, 2018, the Texas State Securities Board issued an emergency cease and desist order against BitConnect.   On January 12, the North Carolina Order was issued.

70.     On January 13, BitConnect's website went down.   According to BitConnect's Twitter account, this was due to "server issues", which it then said were caused by an attack by unnamed people through a DDoS process (also known as "denial of service" attack).   A few days later, the website was back up, but the lending program had been shut down.



71.     Plaintiffs and the Class logged on to find their entire accounts had been converted to BCC at a price of $363 each and that BitConnect would no longer honor the promises for paying

interest and return of principal in the lending program.  The price of BCC plummeted on the exchanges when BitConnect announced it had closed the trading platform.  As of January 25, 2018, the price was down to $11.03.

72.     On January 25, 2018, Maasen posted a new video promoting Davor, another lending site that is exactly like BitConnect.  That video is available here: https://www.youtube.com/watch?v=az7vh1dGIpM.

## FACTS SPECIFIC TO EACH PLAINTIFF

### Paul Long

73.     Plaintiff, Paul Long, first viewed a video from Maasen the week of September 25, 2017.  The video was substantially the same as the one cited above, contained the same or substantially the same representations, and contained the same overall message and representation as the one above.  However, the exact video Plaintiff saw has been taken down off YouTube.com by Maasen.

74.     Following Maasen's advice, he deposited .9756 BTC (approximately $4,297.06) to try out BitConnect.

75.     After receiving returns on his initial investment (another hallmark of Ponzi schemes), Plaintiff invested another .3221 BTC (approximately $1,537.03) on October 9, 2017.

76.     On October 12, 2017, he invested an additional .3420 BTC (approximately $1,856.00).

77.     On October 19, 2017, he invested .3510 BTC (approximately $1,998.59).

78.     In addition to these larger investments, Plaintiff continued to re-investment any gains he made on his investments, as encouraged by Defendants, from October 9, 2017 until his final re-investment on January 9, 2018.

79.     As of today, his total investment is worth a few hundred dollars.

<u>Kiandra Love</u>

80.     Plaintiff Kiandra Love first viewed a video from Maasen on or around October 10, 2017.  The video was substantially the same as the one cited above, contained the same or substantially the same representations, and contained the same overall message and representation as the one above.  However, the exact video Plaintiffs saw has been taken down off YouTube.com by Maasen.

81.     Following Maasen's advice, on October 10, 2017 she deposited $100 to try BitConnect.

82.     After receiving returns on her initial, small investment (a hallmark of Ponzi schemes), Plaintiff deposited $10,000 on October 25, 2017.

83.     On November 14, 2017, Ms. Love made her final investment of $1,010.

84.     As of today, her total investments are worth only a few hundred dollars.

## CLASS ALLEGATIONS

85.     Plaintiffs bring this action on behalf of themselves and as a class action, pursuant to the provisions of Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following classes:

**The National Class**

**All United States residents who invested money in the BitConnect lending program between January 17, 2017 and January 17, 2018, through the transfer of Bitcoin or any other currency to BitConnect.**

**All United States residents who invested money with BitConnect under Maasen's affiliate code, referral program, or otherwise in a way that resulted in Maasen receiving any bonus, money, thing of value or other benefit from the class member investing with BitConnect.**

**The Florida Class**

**All Florida residents who invested money in the BitConnect lending program between January 25, 2017 and January 17, 2018, through the transfer of Bitcoin or any other currency to BitConnect.**

**All Florida residents who invested money with BitConnect under Maasen's affiliate code, referral program, or otherwise in a way that resulted in Maasen receiving any bonus, money, thing of value or other benefit from the class member investing with BitConnect.**

86.     Excluded from the Class are Defendants and their subsidiaries; all persons who make a timely election to be excluded from the Class; governmental entities; and the judge to whom this case is assigned and his/her immediate family. Plaintiffs reserve the right to revise the Class definition based upon information learned through discovery.

87.     Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

88.     This action has been brought and may be properly maintained on behalf of the Class proposed herein under Federal Rule of Civil Procedure 23.

89.     Numerosity. Federal Rule of Civil Procedure 23(a)(1): The members of the Classes are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. While Plaintiffs are informed and believe that there are not less than hundreds of thousands of members of the Class, the precise number of Class members in Florida is unknown to Plaintiffs, but may be ascertained from Defendants' books and records. Class members may be

notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

90.     Commonality and Predominance: Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3): This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

    a.   Whether Defendants engaged in the conduct alleged herein;

    b.   Whether Defendants violated federal and state securities law;

    c.   Whether Defendants' representations about BitConnect were false, misleading, fraudulent other otherwise untrue;

    d.   Whether BCC and/or the BitConnect lending program was an investment;

    e.   Whether BitConnect and Plaintiffs and the Class entered into an investment contract with promises by BitConnect;

    f.   Whether Maasen misrepresented the risks of BitConnect;

    g.   Whether the Defendants misrepresented the risks of BitConnect;

    h.   Whether BitConnect knowingly and intentionally operated a Ponzi scheme and/or pyramid scheme;

    i.   Whether Plaintiffs and the other Class members are entitled to damages and other monetary relief and, if so, in what amount.

91.     Typicality: Federal Rule of Civil Procedure 23(a)(3): Plaintiffs' claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through Defendants' wrongful conduct as described above.

92.     Adequacy: Federal Rule of Civil Procedure 23(a)(4): Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other members of

the Classes they seek to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously. The Classes' interests will be fairly and adequately protected by Plaintiffs and their counsel.

93.     Declaratory and Injunctive Relief: Federal Rule of Civil Procedure 23(b)(2): Defendants have acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Classes, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class as a whole.

94.     Superiority: Federal Rule of Civil Procedure 23(b)(3): A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for members of the proposed Florida Class to individually seek redress for Defendants' wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## COUNT I
## VIOLATION OF FLORIDA SECURITIES LAWS

95.     To effectuate the transactions described in this Complaint, BitConnect created its own coin, BCC.  BCC had no inherent value and no use other than trading for Bitcoin.

96.     Under the "BitConnect Lending Program," investors would "invest" into the BitConnect BCC Exchange with Bitcoin – either by using Bitcoin already owned or purchasing Bitcoin with a fiat currency.

97.     Once the investor deposited the Bitcoin into the BitConnect BCC Exchange platform, BitConnect instructed the investors to sell their Bitcoin to BitConnect in exchange for BitConnect's digital coin, BCC.

98.     Then, BitConnect instructed the investors to "lend" their BCC back to BitConnect, explaining that the BCC "lent" will be used to fund the trading activities of its secret, proprietary trading system called "volatility software."

99.     BitConnect repeatedly referred to this scheme as an investment and offered and sold its investments through its "BitConnect Lending Program."

100.    BitConnect investments are "securities" as defined in Fla. Stat. § 517.021.

101.    BitConnect unlawfully offered and sold unregistered securities in Florida in violation of Fla. Stat. §517.07.

102.    Ryan Maasen violated Fla. Stat. § 517.07, *et seq.* by soliciting and promoting the sale of unregistered securities to Plaintiffs.

103.    Under Fla. Stat. § 517.301, it is unlawful for any person or entity, in connection with the offer or sale of any security, whether offered or sold indirectly or directly: "1. To employ any device, scheme, or artifice to defraud; 2. To obtain money by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or 3.  To engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon any person."

104.    Defendants violated Fla. Stat. § 517.301 when, in connection with the offer or sale of a security to Plaintiffs and the Class, employed a scheme to defraud Plaintiffs and the Class, made untrue and misleading statements of material facts, and engaged in a practice and course of business which operated as a fraud on Plaintiffs and the Class

105.    Defendants violated Florida securities laws, specifically Fla. Stat. 517.011, *et seq.*, through their actions detailed above.

106.    As a result of the violation of these statutes, Plaintiffs and the Class lost money in investments that they otherwise would not have made had they known the truth.

**COUNT II**
**VIOLATION OF SECTION 5(A) AND 5(C) OF THE FEDERAL SECURITIES ACT**

107.    Plaintiff hereby incorporates by reference the factual allegations in Count I, paragraphs 95-99.

108.    Defendants violated federal securities laws through their use of websites and transactions in interstate commerce as described in detail above and specifically, in paragraphs 96-100.

109.    Defendants are each a "seller" under 15 U.S.C. 77e because it and/or its agents, such as Maasen, solicited investments from Plaintiffs and the Class.

110.    The Bitcoin, money or other things of value paid by Plaintiffs and the Class were pooled by BitConnect so that it could profit for itself at the expense of investors such as Plaintiffs and the Class.  As a result, Plaintiffs and the Class, shared in the risks and benefits of the investments.

111.    Plaintiffs and the Class relied on and depended on the expertise of Defendants for their investment returns.

112.     Plaintiffs and the Class reasonably expected to receive profits from their investments with and through Defendants.

113.     BitConnect's investment platform and BCC are investment contracts, subject to federal securities laws, and therefore, Defendants were required to register BCC as such.

114.     However, Defendants failed to register BCC or the BitConnect lending platform with the Securities and Exchange Commission ("SEC") or any federal agency.

115.     Defendants' conduct violates 5(a) and 5(c) of the Securities Act, 15 USC 77e(a) and 77e(c).

116.     Because of Defendants' unregistered sales of securities, Plaintiffs and the Class suffered damages as described above.

**COUNT III**
**BREACH OF CONTRACT**

117.     Plaintiffs reallege the factual allegations contained in Paragraphs 1-7, and 20-84 as if set forth herein.

118.     BitConnect created a trading and lending platform that promised substantial, fixed returns and a complete return of principal at a fixed time in the future that benefited from volatility.

119.     That is, users like Plaintiffs and the Class would invest money in BitConnect through a "lending" platform, and in exchange, BitConnect promised to pay them a daily interest rate, and a bonus interest percentage, and then return the principal amount "lent" or invested.

120.     BitConnect promised these returns through a secret, proprietary trading algorithm called "volatility software interest."

121.     The terms of the transaction between Plaintiffs and BitConnect and the Class and BitConnect are a contract under which BitConnect would pay a daily interest rate, plus bonus percentage, plus return principal on a specific date.

122.    The terms of the contract were clear, unambiguous, not subject to any other interpretation other than where Plaintiffs would receive the benefit of their bargain.

123.    BitConnect has breached the contract by failing to pay daily interest, failing to pay bonus interest, and failing to return Plaintiffs' principal.

124.    Instead, BitConnect unilaterally converted Plaintiffs' investments into a worthless BCC token that has little to no value, and shut down the lending platform.

125.    Plaintiffs and the Class are entitled to damages from the breach of contract as alleged above, including, but not limited to, return of principal, interest, attorneys' fees and other foreseeable damages from the total loss of this investment.

**COUNT IV**
**FRAUD BY CONCEALMENT**

126.    Plaintiffs repeat and reallege the factual allegations contained in Paragraphs 1-7 and 20-84 as if set forth herein.

127.    BitConnect intentionally misled Plaintiffs and the Class, and intentionally withheld material facts about BitConnect from Plaintiffs and the Class, including, but not limited to, the following:

    a.  The identity of the principals of BitConnect and the true location of BitConnect's operations and management;

    b.  Information about the assets and liabilities of BitConnect and any other information that indicates the means by which BitConnect will provide investors with a guaranteed daily return, regardless of the value of Bitcoin;

    c.  Information about the proprietary, secret trading system that it calls its "volatility software," details of its trading records and historical performance, proof of its existence, and the risk factors associated with its use;

    d.   That the BitConnect investments are securities and are not registered with the Administrator or any other governing regulator;

    e.   That only registered dealers or agents can be paid commissions for referrals or sales of securities; and

    f.   That affiliates who receive such commissions for their sale of BitConnect investments without being properly registered are in violation of the Securities Act of 1933.

128.    Defendants intentionally concealed and suppressed these material facts concerning the true nature of the investment as described in detail above.

129.    Plaintiffs and the Class reasonably relied upon Defendants' false representations.

130.    Defendants' false representations were material to Plaintiffs because they went to the heart of the bargain, an easy return on investment in the volatile and complicated cryptocurrency market.

131.    Defendants had a duty to disclose the scheme it was engaged in because they had exclusive knowledge as to implementation and maintenance of their scheme, and because they knew facts not known to or reasonably discoverable by Plaintiffs or the Class.

132.    Defendants actively concealed and/or suppressed these material facts as described above, in whole or in part, to pad and protect its profits and to avoid scrutiny over its claimed investment returns.

133.    On information and belief, Defendants have still not made full and adequate disclosures, and continue to attempt to defraud Plaintiffs and the Class by concealing material information regarding the true value of BCC, by promoting another lending scheme, by promoting

another coin exchange, and otherwise continuing to engage in the behavior complained of above in new schemes and frauds.

134.    Because of the concealment and/or suppression of the facts, Plaintiffs and the Class have sustained damages as outlined above.  Accordingly, Defendants are liable to Plaintiffs and the Class for damages in an amount to be proven at trial.

135.    Defendants' actions were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the rights of Plaintiffs and the Class, and the conduct as alleged warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which is to be determined according to proof.

**COUNT V**
**VIOLATION OF FLORIDA CONSUMER PROTECTION ACT**

136.    Plaintiffs repeat and reallege the factual allegations contained in Paragraphs 1-7 and 20-84 as if set forth herein.

137.    BitConnect scammed Floridians by creating a so-called trading and lending platform that promised substantial, fixed returns and a complete return of principal at a fixed time in the future.

138.    BitConnect promised investors a daily interest rate, and a bonus interest percentage, and then return the principal amount "lent" or invested through a secret, proprietary trading algorithm called "volatility software interest."

139.    To facilitate its scam, BitConnect created its own coin called BCC.

140.    Under the "BitConnect Lending Program," investors provided BitConnect with Bitcoin in exchange for BCC.

141.    Then, BitConnect instructed the investors to "lend" their BCC back to BitConnect, explaining that the BCC "lent" will be used to fund the trading activities of its secret, proprietary trading system called "volatility software."

142.    BitConnect further used promoters, like Maasen, to encourage users to invest more money by watching these promoters get rich from their investments with BitConnect.  BitConnect provided promoters, like Massen, with kickbacks for signing up new "investors" under the promoter's affiliate code.

143.    Maasen knew about and understood the dangerous qualities of this fraudulent scheme, but nonetheless knowingly participated in duping Plaintiff and the Class to "invest" with and in BitConnect.

144.    Defendants are liable to Plaintiffs and the Class pursuant to the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. 510.201, *et. seq.*

145.    Defendants and their agents were in the business of marketing and selling a product or service to Plaintiffs and the Class, and profited therefrom.

146.    Defendants and/or their agents designed, formulated, manufactured, assembled, prepared for sale, distributed, and/or sold the BitConnect lending platform, BCCs and all other parts of the scheme described above.  These actions constitute unfair methods of practice and unfair or deceptive acts or practices in the conduct of a trade or commerce, which is unlawful.

147.    Privity existed between Plaintiffs and the Class and Defendants.

148.    Plaintiffs and the Class, while using and purchasing BCC and transferring money to BitConnect as described above, in the usual and customary manner, suffered substantial losses and harms as described herein.

149.    As a direct and proximate result of Defendants' conduct, Plaintiffs and the Class

are entitled to recover actual damages including but not limited to loss of value of their investments, attorneys' fees and costs, and other equitable relief pursuant to Fla. Stat. 510.201, *et. seq.*

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on the Class, respectfully request that the Court enter judgment in their favor and against Defendants, as follows:

A.      Certification of the proposed Class(es), including appointment of Plaintiffs' counsel as Class Counsel;

B.      An order temporarily and permanently enjoining Defendants from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

C.      An order temporarily and permanently enjoining Defendants from selling, liquidating, transferring, spending or otherwise dissipating assets earned from Plaintiffs and the Class;

D.      Injunctive relief in the form of a rescission, refund or replacement program to make Plaintiffs and the Class whole;

E.      Costs, restitution, damages, including punitive damages, and disgorgement in an amount to be determined at a jury trial;

F.      An order requiring Defendants to pay both pre- and post-judgment interest on any amounts awarded;

G.      An award of costs and attorneys' fees; and

H.      Such other or further relief as may be appropriate.

**<u>DEMAND FOR JURY TRIAL</u>**

Plaintiffs demand a trial by jury on issues so triable.

/s/ Steven W. Teppler
_____

**STEVEN TEPPLER**

FBN: 14787
**ABBOTT LAW GROUP, P.A.**
2929 Plummer Cove Road
Jacksonville, FL  32223
Telephone: 904.292.1111
Facsimile: 904.292.1220
steppler@abbottlawpa.com

**JOHN A. YANCHUNIS, ESQUIRE**
FBN: 0324681
jyanchunis@forthepeople.com
**MORGAN & MORGAN**
**COMPLEX LITIGATION GROUP**
201 North Franklin Street, 7th Floor
Tampa, Florida  33602
(813) 223-5505 Telephone
(813) 223-5402 Facsimile

**JONES WARD PLC**
Jasper D. Ward IV
Alex C. Davis
The Pointe
1205 E. Washington Street, Suite 111
Louisville, Kentucky 40206
T: (502) 882-6000
jasper@jonesward.com
alex@jonesward.com
*Admission Pro Hac Vice Pending*

Abigale Rhodes Green
ABIGALE RHODES GREEN INJURY LAW, PLLC
1800 Kentucky Home Life Building
239 S. Fifth Street
Louisville, KY  40202
(502) 736-8159
agreen@arglawfirm.com
*Admission Pro Hac Vice Pending*

*Counsel for Plaintiffs and the Class*

Certificate of Service

I hereby certify that a copy of the foregoing has been furnished to all council of record via CM/ECF this 13th day of February, 2018.

/s/
_____
Steven W. Teppler